PAUL K. HAINES (SBN 248226)
phaines@haineslawgroup.com
FLETCHER W. SCHMIDT (SBN 286462)
fschmidt@haineslawgroup.com
ANDREW J. ROWBOTHAM (SBN 301367)
arowbotham@haineslawgroup.com
IAN T. MALLERY (SBN 359132)
imallery@haineslawgroup.com
HAINES LAW GROUP, APC
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355

JOSEPH TOJARIEH (SBN 265492)
jft@stonebrooklaw.com
STONEBROOK LAW
10250 Constellation Boulevard, Suite 2300
Los Angeles, California 90067
Tel: (310) 553-5533

Attorneys for Plaintiffs
OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NEW YORK LIFE INSURANCE COMPANY, a New York corporation; NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, a Delaware corporation; NYLIFE INSURANCE COMPANY OF ARIZONA, an Arizona corporation; NYLIFE SECURITIES LLC, a Delaware limited liability company; and DOES 1 through 20, inclusive,

Defendants.

CASE NO. 3:26-cv-05141-JSC

**DECLARATION OF OLGA BROWN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OF INDIVIDUAL CLAIMS, DISMISS CLASS CLAIMS, AND STAY ACTION**

Date: October 1, 2026
Time: 10:00 a.m.
Courtroom: 8, 19th Floor
Judge: Jacqueline Scott Corley

Filed: April 15, 2026
Removed: May 29, 2026
Trial Date: None Set

# DECLARATION OF OLGA BROWN

I, Olga Brown, declare:

I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them under oath:

## I. BACKGROUND

1. I was 63 years old when I began working for New York Life. My maiden name is Olga Ramos. I was born and raised in Mexico City. I earned a degree in graphic design from Universidad Anáhuac in Mexico City in about 1984, and a postgraduate degree in real estate finance from Universidad Iberoamericana in about 1992. Both degrees were earned in Mexico, and my coursework was in Spanish.

2. Spanish is my first language and the language I am most comfortable in. I can speak and read everyday English. I am not familiar with legal terms or with more elaborate English.

3. New York Life knew I was from Mexico City. Raymond Stellhorn, the partner who recruited me and to whom I reported, knew this because his wife is from Mexico and we talked about it. No one at New York Life ever offered to give me any of the documents I was asked to sign in Spanish, and no one ever gave me a Spanish version of any of them.

4. Before New York Life, I had never heard the word “arbitration,” and I did not know what an arbitration agreement was. The New York Life documents are the only documents containing arbitration provisions that I am aware of ever signing. I had never been a party to a lawsuit. I have never taken a business law, contracts, or other legal course, and I have no legal training.

5. At the time New York Life recruited me, I was not working anywhere else.

6. I worked for New York Life out of its Newport Beach office, which reports to New York Life’s Southern California General Office in Glendale. I began the onboarding process in about January 2025 and stopped working for New York Life

in about February 2026.

7. My work began under New York Life's Introductory Contract, which New York Life called the "PTAS" contract. I signed that contract on or about February 7, 2025. During that introductory phase, New York Life treated me as an independent contractor while I completed its required training modules and background checks and sold policies on a provisional basis.

8. On or about April 8, 2025, I signed a Training Allowance Subsidy Plan Agreement (the "TAS Agreement"). From that point until my separation, New York Life treated me as a W-2 employee during what it called the "TAS" phase. I never reached the phase New York Life called "N9."

## II. THE RECRUITING PROCESS

9. Raymond Stellhorn, who also goes by his wife's surname, Tavera, found me on LinkedIn and called me to ask whether I would interview for a position. I had never heard of him before that call. I did not apply to New York Life.

10. I went to New York Life's Newport Beach office to interview with Mr. Stellhorn. I told him directly that I would not work on commission alone. He told me that would not be the case and that I would receive a base of about $2,000 to $2,500 a month in addition to anything else I earned.

11. Mr. Stellhorn did not tell me during that interview that the base he described depended on meeting monthly production requirements. I learned only later that I had to close three or four life insurance policies a month to receive it.

12. The managers I met at New York Life wore expensive watches and suits. They talked about qualifying for what they called "Council" and about the trips that came with qualifying, including trips to Walt Disney World, to Denver, and to Morocco. They said that if I followed what they told me to do, I could expect to earn on the order of $100,000 in my first year, and that the renewals on the policies I sold would eventually build into something like a pension.

///

13. I was excited by what New York Life described and I wanted to start right away.

14. However, what they described did not happen. I followed what New York Life told me to do and did not see the results they had described. New York Life also required me to spend my own money throughout. I paid for my own transportation expenses, including $150 per month for parking; a chamber of commerce membership; weekend networking and golf events; promotional materials and business cards bearing the New York Life name; and other expenses.

## III. THE ONBOARDING PAPERWORK

15. New York Life told me that I had to sign a set of documents before I could start. Mr. Stellhorn and a person in onboarding named Ovsanna Kopalyan told me what to sign, when to sign it, and how to reach the website where the documents were.

16. My understanding was that signing the documents was a condition of working at New York Life. I understood that I could not start unless I signed them. When I asked about the documents, I was told in substance that they were the standard documents.

17. New York Life sent me the documents electronically, to my personal email address, olgacbrown@me.com.

18. The contracts I was asked to sign were long and were written in English legal terminology. I can read everyday English, but the language in those contracts was well beyond the English I use. No one at New York Life offered to explain the documents to me, to go through them with me, or to provide them in Spanish. I signed them because I wanted to begin working.

19. During the introductory phase, I was not paid at all. New York Life required me to sell three life insurance policies before I would be “triggered,” which is the word New York Life used, into the TAS phase and begin being paid. I received no money from New York Life until I triggered in about April 2025.

20. During the introductory phase, New York Life also required me to complete training modules on its online training platform within set deadlines, to go through background checks, and to come to the office every day at my own expense.

21. The documents were presented to me with a "Start" button and highlighted "Sign" tabs that moved from one signature field to the next. I followed the tabs. Nothing in that process alerted me to the arbitration provisions or required me to open those sections before signing.

## IV. WHAT I WAS NOT TOLD ABOUT THE DOCUMENTS

22. No one at New York Life ever told me that I could negotiate any of the terms in any of the documents and, in fact, there was never any negotiation.

23. No one at New York Life asked me whether I had questions or whether I wanted any changes. The electronic signature format did not allow me to edit, strike, or add anything. The only thing I could do was sign in the fields New York Life had marked.

24. No one at New York Life ever told me that I could decline any part of the paperwork and still work there. I was never offered any way to opt out of the arbitration provisions, and I am not aware of any.

25. No one at New York Life mentioned or explained arbitration to me during recruiting or onboarding. No one separately told me that the documents contained arbitration provisions or explained what those provisions meant. I did not know what arbitration was.

26. No one explained to me how arbitration works, what it costs, who pays for it, how long it takes, or what its procedures are. No one explained that by signing I would be giving up the right to have a judge or jury decide a dispute with New York Life or the right to bring or join a class action. No one explained any circumstances in which I could be required to share arbitration costs with New York Life.

27. No one at New York Life told me that I could or should have a lawyer review the documents before I signed them, and no lawyer reviewed them for me.

28. No one gave me a copy of the FINRA arbitration rules or the American Arbitration Association employment arbitration rules that the documents refer to, and no one explained to me that those rules could change over time.

## V. THE ARBITRATION PROVISIONS

29. I have now reviewed Exhibits A and B to the Declaration of Nicholas Blahovec (the "Blahovec Declaration").

30. Exhibit A contains ten numbered pages of the Introductory Contract and does not include a countersignature page.

31. Exhibit B contains seven numbered pages of the TAS Agreement and also does not include a countersignature page.

32. Each document states that it is not effective unless a countersignature page is issued, signed, and countersigned by New York Life's authorized representatives and specifies the effective date.

33. The Introductory Contract's arbitration provision is Section 21 of its 25 numbered sections, on pages 8 and 9. The TAS Agreement's arbitration provision is Section 19 of its 21 numbered sections and begins on page 6. The title and first page of each document say nothing about arbitration.

34. Each of these documents is a preprinted New York Life form, printed in English, with blanks for the agent's name, address, and general office. The documents were prepared before I saw them, and I had no role in preparing them.

35. The arbitration provisions were not presented to me as separate agreements. Each was placed within a longer contract among sections addressing premiums, commissions, ledgers, liens, and similar subjects. Nothing in the emails from New York Life, and no one at New York Life, directed me to those sections.

36. I was never registered with FINRA. No one at New York Life ever explained to me that the documents I signed would send any dispute about my pay to a securities-industry forum I was not part of.

///

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 3, 2026, at Costa Mesa, California.

Signed by:
Olga Brown
C2B6CE0D7FDF4EB...
OLGA BROWN