PAUL K. HAINES (SBN 248226)
phaines@haineslawgroup.com
FLETCHER W. SCHMIDT (SBN 286462)
fschmidt@haineslawgroup.com
ANDREW J. ROWBOTHAM (SBN 301367)
arowbotham@haineslawgroup.com
IAN T. MALLERY (SBN 359132)
imallery@haineslawgroup.com
HAINES LAW GROUP, APC
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355

JOSEPH TOJARIEH (SBN 265492)
jft@stonebrooklaw.com
STONEBROOK LAW
10250 Constellation Boulevard, Suite 2300
Los Angeles, California 90067
Tel: (310) 553-5533

Attorneys for Plaintiffs
OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NEW YORK LIFE INSURANCE COMPANY, a New York corporation; NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, a Delaware corporation; NYLIFE INSURANCE COMPANY OF ARIZONA, an Arizona corporation; NYLIFE SECURITIES LLC, a Delaware limited liability company; and DOES 1 through 20, inclusive,

Defendants.

CASE NO. 3:26-cv-05141-JSC

**DECLARATION OF WILLIAM MOORE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OF INDIVIDUAL CLAIMS, DISMISS CLASS CLAIMS, AND STAY ACTION**

| | |
|---|---|
| Date: | October 1, 2026 |
| Time: | 10:00 a.m. |
| Courtroom: | 8, 19th Floor |
| Judge: | Jacqueline Scott Corley |

| | |
|---|---|
| Filed: | April 15, 2026 |
| Removed: | May 29, 2026 |
| Trial Date: | None Set |

# DECLARATION OF WILLIAM MOORE

I, William Moore, declare:

I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them under oath:

## I. BACKGROUND

1. I was 51 years old when I began working for New York Life.

2. I had seen the word "arbitration" before, but did not know what the word actually meant or what arbitration involved. I had never been a party to a lawsuit. I have no legal training, and I have never taken any course in law or contracts.

3. I worked for New York Life out of its Newport Beach office, which reports to New York Life's Southern California General Office in Glendale. I worked there for about a year, from about January 2025 until about February 2026.

4. My work began under New York Life's Introductory Contract, which New York Life called the "PTAS" contract. I signed that contract on or about December 20, 2024. During that introductory phase, New York Life treated me as an independent contractor while I completed its required onboarding and sold policies on a provisional basis.

5. On or about April 7, 2025, I signed a Training Allowance Subsidy Plan Agreement (the "TAS Agreement"). From that point until my separation, New York Life treated me as a W-2 employee during what it called the "TAS" phase. I never reached the phase New York Life called "N9," which New York Life also referred to as becoming an "established" agent.

## II. THE RECRUITING PROCESS

6. I applied to New York Life through a job site. I knew that New York Life existed because a friend of mine worked there, but I did not know how the business model worked or any of the details behind it.

7. Raymond Stellhorn-Tavera owned the job posting and contacted me after I applied. He became the person I reported to at New York Life. I went to the Newport

Beach office for several interviews with him in person.

8. When I applied to New York Life, I was under significant financial pressure. My consulting income had stopped roughly two years earlier, and the side business I turned to was operating at a loss. I was not able to pay my bills. That financial pressure is the reason I applied to New York Life in the first place.

9. During my interviews, Mr. Stellhorn described the position to me in terms of how much money I would make if I followed New York Life's system. What he described was a great deal of money, and none of it sounded out of reach at the time.

10. Given my circumstances, I accepted the position and wanted to sign the paperwork and start right away.

11. However, what was described to me never happened. I did not make money at New York Life. Between what I earned and what I paid out of my own pocket for events and other costs, I, in fact, lost money.

## III. THE ONBOARDING PAPERWORK

12. Mr. Stellhorn told me to sign the documents as soon as possible so that we could get things started. Those were, in substance, his words.

13. Mr. Stellhorn explained that the paperwork was the gating factor for everything else. New York Life ran a training program the company referred to as FCS, and the next session was starting soon. Completing the paperwork was what determined whether I got into that session. He described it in a way that suggested not everyone was invited.

14. I understood that I had to sign the documents before I could start, and that the work I did during the introductory phase would not be paid unless and until I signed the TAS paperwork.

15. Some of the documents came to me electronically and some had to be signed by hand and scanned or sent in.

16. The contracts New York Life asked me to sign were long. The specific terms and the mechanics they described were not familiar to me, and I did not

understand a great deal of what I was reading. The documents were overwhelming, and given the financial position I was in, I felt that signing them was simply something I had to do to get to the point of earning.

17. The documents that came electronically were presented with a sign button and highlighted tabs that jumped from one signature field to the next. I followed the tabs. Nothing in that process gave me any separate alert identifying the arbitration provisions.

## IV. WHAT I WAS NOT TOLD ABOUT THE DOCUMENTS

18. No one at New York Life ever told me that I could negotiate any of the terms in any of the documents and, in fact, there was never any negotiation.

19. No one at New York Life asked me whether I had questions or whether I wanted any changes. The electronic signature format did not allow me to edit, strike, or add anything. The only thing I could do was sign in the fields New York Life had marked.

20. No one at New York Life ever told me that I could decline any part of the paperwork and still work there. I was never offered any way to opt out of the arbitration provisions, and I am not aware of any.

21. No one at New York Life mentioned or explained arbitration to me during recruiting or onboarding. No one separately told me that the packets contained arbitration provisions or explained what those provisions meant.

22. No one explained to me how arbitration works, what it costs, who pays for it, how long it takes, or what its procedures are. No one explained that by signing I would be giving up the right to have a judge or jury decide a dispute with New York Life or the right to bring or join a class action. No one explained any circumstances in which I could be required to share arbitration costs with New York Life.

23. No one told me that I could or should have a lawyer review the documents. I did not have a lawyer, and I did not have anyone with legal training available to me at any point during the hiring process or when I signed.

24. I do not recall being given a copy of the FINRA arbitration rules or the American Arbitration Association employment arbitration rules that the documents refer to, and no one explained to me that those rules could change over time.

## V. THE ARBITRATION PROVISIONS

25. I have now reviewed Exhibits C and D to the Declaration of Nicholas Blahovec (the "Blahovec Declaration").

26. Exhibit C contains ten numbered pages of the Introductory Contract and does not include a countersignature page.

27. Exhibit D contains seven numbered pages of the TAS Agreement and also does not include a countersignature page.

28. Each document states that it is not effective unless a countersignature page is issued, signed, and countersigned by New York Life's authorized representatives and specifies the effective date.

29. The Introductory Contract's arbitration provision is Section 21 of its 25 numbered sections, on pages 8 and 9. The TAS Agreement's arbitration provision is Section 19 of its 21 numbered sections and begins on page 6. The title and first page of each document say nothing about arbitration.

30. Each of these documents is a preprinted New York Life form with blanks for the agent's name, address, and general office. The documents were prepared before I saw them, and I had no role in preparing them.

31. The arbitration provisions were not presented to me as separate agreements. Each was placed within a longer contract among sections addressing premiums, commissions, ledgers, liens, and similar subjects. Nothing in the communications from New York Life, and no one at New York Life, directed me to those sections.

32. I was not registered with FINRA when I signed either of these contracts. I became registered with a Series 6 license in about June 2025, months after I signed the Introductory Contract and the TAS Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 3, 2026, at Newport Beach, California.

Signed by:
William Greg Moore
2CAD7FB89B61480...
WILLIAM MOORE