PAUL K. HAINES (SBN 248226)
phaines@haineslawgroup.com
FLETCHER W. SCHMIDT (SBN 286462)
fschmidt@haineslawgroup.com
ANDREW J. ROWBOTHAM (SBN 301367)
arowbotham@haineslawgroup.com
IAN T. MALLERY (SBN 359132)
imallery@haineslawgroup.com
HAINES LAW GROUP, APC
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355

JOSEPH TOJARIEH (SBN 265492)
jft@stonebrooklaw.com
STONEBROOK LAW
10250 Constellation Boulevard, Suite 2300
Los Angeles, California 90067
Tel: (310) 553-5533

Attorneys for Plaintiffs
OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NEW YORK LIFE INSURANCE COMPANY, a New York corporation; NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, a Delaware corporation; NYLIFE INSURANCE COMPANY OF ARIZONA, an Arizona corporation; NYLIFE SECURITIES LLC, a Delaware limited liability company; and DOES 1 through 20, inclusive,

Defendants.

CASE NO. 3:26-cv-05141-JSC

**DECLARATION OF MICHAEL SANDOVAL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OF INDIVIDUAL CLAIMS, DISMISS CLASS CLAIMS, AND STAY ACTION**

Date: October 1, 2026
Time: 10:00 a.m.
Courtroom: 8, 19th Floor
Judge: Jacqueline Scott Corley

Filed: April 15, 2026
Removed: May 29, 2026
Trial Date: None Set

# DECLARATION OF MICHAEL SANDOVAL

I, Michael Sandoval, declare:

I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them under oath:

## I. BACKGROUND

1. I attended California State University, East Bay, in Hayward, California, where I earned a Bachelor of Science in business management. I graduated in about May 2023. I was about 22 years old when I started at New York Life, and New York Life was my first job out of college. Before New York Life, my only work experience was as a bartender and a server at restaurants while I was in school.

2. Before New York Life, I had never heard the word "arbitration." I did not know what an arbitration agreement was, and I had never signed or reviewed one. I had never been a party to a lawsuit or hired a lawyer, and I had never taken a business law, contracts, or other legal course.

3. I worked for New York Life out of its San Francisco General Office at 425 Market Street.

4. My work began under New York Life's Introductory Contract, which New York Life called the "PTAS" contract. I signed that contract on or about June 17, 2023. During that introductory phase, New York Life treated me as an independent contractor while I sold policies on a provisional basis in order to reach the production level New York Life required.

5. On or about November 28, 2023, I signed a Training Allowance Subsidy Plan Agreement (the "TAS Agreement"). From that point until my separation in about November 2024, New York Life treated me as a W-2 employee during what it called the "TAS" phase. I never reached the phase New York Life called "N9."

## II. THE RECRUITING PROCESS

6. New York Life recruited me in two ways at once. I received repeated messages on LinkedIn from people at New York Life, and I was contacted directly and

frequently by friends of mine who already worked there.

7. I did not respond to the LinkedIn messages. What actually brought me in was a friend who worked at New York Life and who offered to show me around the office and introduce me personally to his manager.

8. I later learned how New York Life's recruiting works. Agents are paid a percentage of what the people they recruit earn. The friends who brought me in stood to be paid a bonus based on what I produced if I joined.

9. I met with several New York Life managers in person. They told me that I would earn around $100,000 in my first year, that the position was pure commission, and that if I worked hard I would be a millionaire in a couple of years. They wore expensive watches and suits and talked about how much money they were making.

10. I accepted the position essentially on the spot. However, I earned very little at New York Life, far less than what I had been told.

## III. THE ONBOARDING PAPERWORK

11. New York Life told me that I had to sign the onboarding documents before I could start. I was told the documents were standard.

12. I felt rushed. I was told that if I did not sign the documents right away, I could not start producing. I had just come out of college and I needed to start earning.

13. What I received was a single large onboarding packet with a significant number of documents to sign electronically.

14. Because this was my first job out of college, I assumed that everything in the packet was standard and that this was simply how starting a job worked. No one at New York Life told me to be careful, to slow down, or to actually read any particular page or document.

15. The documents themselves were long, and they used language I did not follow. They were overwhelming. I signed them because I wanted to start earning money as soon as possible.

///

16. I was not paid during the introductory phase. I understood that I had to reach the TAS phase before New York Life would pay me, and I understood that I could not move into the TAS phase unless I signed the TAS paperwork.

17. New York Life required me to complete its training modules and go through its background checks as part of getting started as an agent.

18. The documents were presented to me with a "Start" button and highlighted "Sign" tabs that jumped from one signature field to the next. I followed the tabs. I recall seeing yellow buttons and a "Finish" button at the end. Nothing in that process gave me any separate alert identifying the arbitration provisions or required me to open those sections before signing.

## IV. WHAT I WAS NOT TOLD ABOUT THE DOCUMENTS

19. No one at New York Life ever told me that I could negotiate any of the terms in any of the documents and, in fact, there was never any negotiation.

20. No one at New York Life asked me whether I had questions or whether I wanted any changes. The electronic signature format did not allow me to edit, strike, or add anything. The only thing I could do was sign in the fields New York Life had marked.

21. No one at New York Life ever told me that I could decline any part of the paperwork and still work there. I was never offered any way to opt out of the arbitration provisions.

22. No one at New York Life mentioned or explained arbitration to me during recruiting or onboarding. No one separately told me that the packet contained arbitration provisions or explained what those provisions meant.

23. No one explained to me how arbitration works, what it costs, who pays for it, how long it takes, or what its procedures are. No one explained that by signing I would be giving up the right to have a judge or jury decide a dispute with New York Life or the right to bring or join a class action. No one explained any circumstances in which I could be required to share arbitration costs with New York Life.

24. No one told me that I could or should have a lawyer review the documents. I did not have a lawyer, and I did not have anyone with legal training available to me at any point during the hiring process or when I signed.

25. No one gave me a copy of the FINRA arbitration rules or the American Arbitration Association employment arbitration rules that the documents refer to, and no one explained to me that those rules could change over time.

## V. THE ARBITRATION PROVISIONS

26. I have now reviewed Exhibits E and F to the Declaration of Nicholas Blahovec (the "Blahovec Declaration").

27. Exhibit E contains ten numbered pages of the Introductory Contract and does not include a countersignature page.

28. Exhibit F contains seven numbered pages of the TAS Agreement and also does not include a countersignature page.

29. Each document states that it is not effective unless a countersignature page is issued, signed, and countersigned by New York Life's authorized representatives and specifies the effective date.

30. The Introductory Contract's arbitration provision is Section 21 of its 25 numbered sections, on pages 8 and 9. The TAS Agreement's arbitration provision is Section 19 of its 21 numbered sections and begins on page 6. The title and first page of each document say nothing about arbitration.

31. Each of these documents is a preprinted New York Life form with blanks for the agent's name, address, and general office. The documents were prepared before I saw them, and I had no role in preparing them.

32. The arbitration provisions were not presented to me as separate agreements. Each was placed within a longer contract among sections addressing premiums, commissions, ledgers, liens, and similar subjects. Nothing in the emails from New York Life, and no one at New York Life, directed me to those sections.

///

33. I was not registered with FINRA at any time while I worked for New York Life. I held only an insurance license there. I became registered with FINRA later, through a different firm, after my employment with New York Life ended.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 3, 2026, at San Jose, California.

Signed by:
7212A78B042342C...
MICHAEL SANDOVAL