PAUL K. HAINES (SBN 248226)
phaines@haineslawgroup.com
FLETCHER W. SCHMIDT (SBN 286462)
fschmidt@haineslawgroup.com
ANDREW J. ROWBOTHAM (SBN 301367)
arowbotham@haineslawgroup.com
IAN T. MALLERY (SBN 359132)
imallery@haineslawgroup.com
HAINES LAW GROUP, APC
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355

JOSEPH TOJARIEH (SBN 265492)
jft@stonebrooklaw.com
STONEBROOK LAW
10250 Constellation Boulevard, Suite 2300
Los Angeles, California 90067
Tel: (310) 553-5533

Attorneys for Plaintiffs
OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NEW YORK LIFE INSURANCE COMPANY, a New York corporation; NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, a Delaware corporation; NYLIFE INSURANCE COMPANY OF ARIZONA, an Arizona corporation; NYLIFE SECURITIES LLC, a Delaware limited liability company; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. 3:26-cv-05141-JSC<br><br>**DECLARATION OF TOM SCIARA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OF INDIVIDUAL CLAIMS, DISMISS CLASS CLAIMS, AND STAY ACTION**<br><br>Date: October 1, 2026<br>Time: 10:00 a.m.<br>Courtroom: 8, 19th Floor<br>Judge: Jacqueline Scott Corley<br><br>Filed: April 15, 2026<br>Removed: May 29, 2026<br>Trial Date: None Set |

# DECLARATION OF TOM SCIARA

I, Tom Sciara, declare:

I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them under oath:

## I. BACKGROUND

1. I attended California State University, Chico ("Chico State"). I graduated in about May 2021 with a bachelor's degree. I was 21 years old when New York Life recruited me. New York Life was my first job out of college. Before New York Life, my only work experience was part-time work while I was still in school: I did marketing for a small business owner, and I worked on campus for one of the student clubs.

2. Before New York Life, I had never heard the word "arbitration." I did not know what an arbitration agreement was, and I had never signed one. I had never been a party to a lawsuit, never hired a lawyer, and never taken a business law, contracts, or other legal course.

3. I worked for New York Life out of its Greater San Francisco General Office from about May 2021, when my onboarding began, through June 26, 2024. On August 9, 2021, I signed a Training Allowance Subsidy Plan Agreement (the "TAS Agreement") and an Agent's Contract (Form N9). From August 9, 2021 through August 31, 2023, New York Life treated me as a W-2 employee during what it called the TAS phase. From September 1, 2023 through June 26, 2024, New York Life treated me as what it called an "N9" or "established" agent. My work did not change when my label changed.

## II. HOW NEW YORK LIFE RECRUITED ME

4. In about the spring of 2021, during my senior year at Chico State, I was looking for jobs in financial advising on LinkedIn. Anthony Garibaldi, a partner at New York Life's Greater San Francisco General Office, reached out to me on LinkedIn and asked to interview me. I did not apply to New York Life. New York Life

found me.

5. Mr. Garibaldi and I first spoke by phone. He then told me that I needed to come into the office and meet him in person.

**III. THE RECRUITING PROCESS**

6. Mr. Garibaldi told me that I should expect to earn at least six figures in my first year and seven figures after a few years. I was a college senior with little work experience, little money, and no other job offer. I accepted the position on the spot. By the time the paperwork arrived, I had committed to the position and believed that I had to sign New York Life's standard documents to begin work.

**IV. THE ONBOARDING PAPERWORK**

7. After the interview, Mr. Garibaldi told me, in substance, that he liked me and that I would receive onboarding documents that I should sign as soon as possible so we could start working together.

8. My understanding from what Mr. Garibaldi said was that signing the packet was a condition of starting work at New York Life, and that every new agent signed the same "standard" documents.

9. New York Life sent me its contracts electronically, through DocuSign, to my personal email address, tomsciara@gmail.com. As best I can reconstruct it from the documents, the paperwork came in two electronic packets.

10. The first packet came on or about May 27, 2021. The documents I signed that day included an "Introductory Contract" (Form IC-CA-03/21), a one-page form titled "Rule 2263 U4 Arbitration Disclosure," and a "Do Not" policy acknowledgment. I believe the same packet also included a FINRA Form U4 and other New York Life policy acknowledgments.

11. Over roughly the next two months, New York Life put me through its onboarding process. I had to complete training modules on New York Life's online training platform, called NYLIC U, covering life insurance and New York Life itself. I went through background checks, and people from different New York Life

departments called me with questions. I was also required to drive to the San Francisco office to meet with Mr. Garibaldi in person. I had to do all of that before New York Life would allow me to move out of the introductory period and begin the TAS phase.

12. On August 9, 2021, I electronically signed a second packet. It included the TAS Agreement (Form TAS-CA-03/21) and the Agent's Contract (Form N9-CA-03/21) that New York Life attached to its motion as Exhibits G and H to the Declaration of Nicholas Blahovec (the "Blahovec Declaration"). I recall the packet being long and containing many pages.

13. During the Introductory Contract period, New York Life told us that once we hit the required production numbers, we would "trigger" the TAS phase and start receiving the training allowance and bonuses. I understood that New York Life required me to sign the August 2021 packet before it would allow me to enter the TAS phase. After I signed, New York Life began treating me as a W-2 employee. Until I signed that packet, I had not received any commissions or allowance from New York Life for the work I had already done.

14. The packet contained lengthy contracts written in language I had never seen before. It was overwhelming. I went through it, but it was almost impossible to read word by word, and I essentially just signed. By then, I had spent about two months in New York Life's onboarding process, and I understood that until I signed, I could not move out of my introductory period or start receiving the training allowance and commissions New York Life had promised me.

15. DocuSign presented the documents with a "Start" button and highlighted "Sign" tabs that jumped from one signature field to the next. I followed the tabs. DocuSign did not provide any separate alert or pop-up identifying the arbitration provisions or require me to open those sections before signing.

16. Before I could open the documents, DocuSign required me to click "I agree" on an electronic-records consent form. I did not read it. I understood it only as a click-through that I had to accept in order to see the documents at all.

## V. WHAT I WAS NOT TOLD ABOUT THE DOCUMENTS

17. No one at New York Life ever told me that I could negotiate any of the terms in any of the documents and, in fact, there was never any negotiation.

18. No one at New York Life asked me whether I had questions or whether I wanted any changes. The DocuSign format did not allow me to edit, strike, or add anything; the only thing I could do was sign in the fields New York Life had marked.

19. No one at New York Life ever told me that I could decline any part of the paperwork and still work there. I was never offered any way to opt out of the arbitration provisions, and I am not aware of any.

20. No one at New York Life mentioned or explained arbitration to me during recruiting or onboarding. No one separately told me that the packet contained arbitration provisions or explained what those provisions meant. The documents were simply sent to me with the instruction that I had to sign them.

21. No one explained to me how arbitration works, what it costs, who pays for it, how long it takes, or what its procedures are. No one explained that by signing I would be giving up the right to have a judge or jury decide a dispute with New York Life or the right to bring or join a class action. No one explained any circumstances in which I could be required to share arbitration costs with New York Life.

22. No one told me that I could or should have a lawyer review them. I did not have a lawyer, and I did not have anyone with legal training available to me at any point during the hiring process or when I signed.

23. No one gave me a copy of the FINRA arbitration rules or the American Arbitration Association employment arbitration rules that the documents refer to, and no one explained to me that those rules could change over time. I did not know what FINRA or the American Arbitration Association was.

## VI. THE ARBITRATION PROVISIONS

24. I have now reviewed Exhibits G and H to the Blahovec Declaration. Exhibit G contains seven numbered pages of the TAS Agreement and does not include

a countersignature page. Exhibit H contains sixteen numbered pages of the Agent's Contract and also does not include a countersignature page. Each document states that it is not effective unless a countersignature page is issued, signed, and countersigned by New York Life's authorized representatives and specifies the effective date. The TAS Agreement's arbitration provision is Section 19 of its 21 numbered sections and begins on page 6. The Agent's Contract's arbitration provision is Section 23 of its 40 numbered sections and runs from page 9 to page 11. The title and first page of each document say nothing about arbitration.

25. The Introductory Contract that I signed in May 2021, which New York Life did not attach to its motion, is ten pages long. Its arbitration provision is Section 21 of its 25 numbered sections, on pages 8 and 9. The title and first page of the document say nothing about arbitration.

26. Each of these documents is a preprinted New York Life form with blanks for the agent's name, address, and general office. Nothing in them was written for me, and I had no input into any of them.

27. The arbitration provisions in these three contracts were not presented as separate agreements. Each was embedded within a longer contract among sections addressing premiums, commissions, ledgers, liens, and similar subjects. Nothing in the emails from New York Life, and no one at New York Life, directed me to those sections.

28. I have also now seen the one-page form dated May 27, 2021, titled "Rule 2263 U4 Arbitration Disclosure." It was one page among many in the first electronic packet. At the time I signed it, I was not registered with FINRA and had not yet taken any securities licensing examination. I did not become registered with FINRA until roughly the middle of my TAS period, about a year later. I did not understand that the form had anything to do with disputes between me and New York Life over my pay.

///

///

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 3, 2026, at Martinez, California.

DocuSigned by:
8B1B769327AC423...
TOM SCIARA