PAUL K. HAINES (SBN 248226)
phaines@haineslawgroup.com
FLETCHER W. SCHMIDT (SBN 286462)
fschmidt@haineslawgroup.com
ANDREW J. ROWBOTHAM (SBN 301367)
arowbotham@haineslawgroup.com
IAN T. MALLERY (SBN 359132)
imallery@haineslawgroup.com
HAINES LAW GROUP, APC
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355

JOSEPH TOJARIEH (SBN 265492)
jft@stonebrooklaw.com
STONEBROOK LAW
10250 Constellation Boulevard, Suite 2300
Los Angeles, California 90067
Tel: (310) 553-5533

Attorneys for Plaintiffs
OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OLGA BROWN, FERNANDO CORCUCHIA, WILLIAM MOORE, MICHAEL SANDOVAL, TOM SCIARA, and SAMMUEL VALDEZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NEW YORK LIFE INSURANCE COMPANY, a New York corporation; NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, a Delaware corporation; NYLIFE INSURANCE COMPANY OF ARIZONA, an Arizona corporation; NYLIFE SECURITIES LLC, a Delaware limited liability company; and DOES 1 through 20, inclusive,

Defendants.

CASE NO. 3:26-cv-05141-JSC

**DECLARATION OF SAMMUEL VALDEZ IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OF INDIVIDUAL CLAIMS, DISMISS CLASS CLAIMS, AND STAY ACTION**

Date: October 1, 2026
Time: 10:00 a.m.
Courtroom: 8, 19th Floor
Judge: Jacqueline Scott Corley

Filed: April 15, 2026
Removed: May 29, 2026
Trial Date: None Set

# DECLARATION OF SAMMUEL VALDEZ

I, Sammuel Valdez, declare:

I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them under oath:

## I. BACKGROUND

1. Before New York Life, I had never heard of arbitration and had no idea what it was. I do not recall ever signing an arbitration agreement before I signed New York Life's documents. I had never been a party to a civil lawsuit. I have no legal training and have never taken any course in law or contracts.

2. I worked for New York Life out of its Southern California General Office. The offices I worked out of were in Glendale and Pasadena. I worked there from about January 2022 until about April 2025.

3. My work began under New York Life's Introductory Contract, which New York Life called the "PTAS" contract. I signed New York Life's first set of onboarding documents on or about December 27, 2021. That introductory phase lasted about three months. During it, New York Life treated me as an independent contractor while I completed its onboarding and sold policies on a provisional basis.

4. On or about April 1, 2022, I signed a Training Allowance Subsidy Plan Agreement (the "TAS Agreement") and an Agent's Contract. I signed both in the same electronic signature request. From that point, New York Life treated me as a W-2 employee during what it called the "TAS" phase.

5. After the TAS phase, New York Life treated me as what it called a "statutory employee" during the "N9," or "established agent," phase. My work did not change when my label changed. I remained with New York Life until about April 30, 2025.

## II. THE HIRING PROCESS

6. I applied to New York Life through Indeed.com in January 2020.

///

7. After I applied, Grace Schwartz, a partner at New York Life reached out to me. She became my direct partner at New York Life. She set up a phone interview first, and then invited me to an in-person interview at the Pasadena office.

8. Before I was hired, I met with Ms. Schwartz and with a New York Life onboarding person whose name I recall as An Bui.

9. At the in-person interview, Ms. Schwartz told me that my earning potential at New York Life was uncapped. She told me that I could easily earn six figures. She did not tell me what portion of agents actually earn that.

10. The impression of wealth was also part of the interview itself. Ms. Schwartz carried a designer handbag whose brand I recognized, and wore noticeable jewelry. She spoke about having done well for herself, about being able to afford what she had, and about the community she was able to live in.

11. I did not accept the position immediately. I first interviewed in about January 2020, shortly before the COVID-19 pandemic, and I did not join New York Life until about January 2022. Ms. Schwartz reached back out to me after that first interview.

12. When I did accept, I believed what New York Life had told me about what I would earn. I had already begun making plans around that income, including buying a house within a year or two. I later learned that the representations New York Life made to me about earning potential were very misleading.

## III. THE ONBOARDING PAPERWORK

13. Once I accepted, New York Life told me it wanted me to start working right away, and that I needed to sign its onboarding documents first. Ms. Schwartz told me, in substance, that this was what I needed to sign so that they could bring me on board, start training me, and get me earning.

14. I understood that signing the documents was what stood between me and starting work.

///

15. I was told the documents were standard and part of the normal process.

16. The documents were long and written in legal language. I did not understand them. There were documents I simply signed because I was told to sign them.

17. I was not paid at all during the introductory phase. New York Life held the business I submitted and did not pay me for it until it "triggered" me, which was New York Life's word, into the TAS phase. My understanding was that if I had not moved into the TAS phase, I would never have been paid for the work I did during the introductory phase.

18. New York Life sent the documents to me electronically through DocuSign at my personal email address. As stated above, I signed the TAS Agreement and Agent's Contract in the same electronic signature request. I recall that a further set of documents was signed after New York Life approved my contracting, but I cannot now identify those documents.

19. The electronic documents were presented with a start button and highlighted tabs that carried me from one signature field to the next. I clicked through the tabs and signed quickly. Nothing was explained to me and no details were given. Nothing in that process alerted me to an arbitration provision or required me to review that section before signing.

## IV. WHAT I WAS NOT TOLD ABOUT THE DOCUMENTS

20. No one at New York Life ever told me that I could negotiate any of the terms in any of the documents. What was conveyed was that these were the standard terms and that I could accept them or not come on board. In fact, there was never any negotiation.

21. No one at New York Life asked me whether I had questions or whether I wanted any changes. The DocuSign format did not allow me to edit, strike, or add anything. The only thing I could do was sign in the fields New York Life had marked.

///

22. No one at New York Life ever told me that I could decline any part of the paperwork and still work there. I was never offered any way to opt out of the arbitration provisions.

23. No one at New York Life mentioned or explained arbitration to me during recruiting or onboarding. No one separately told me that the packet contained arbitration provisions or explained what those provisions meant.

24. No one explained to me how arbitration works, what it costs, who pays for it, how long it takes, or what its procedures are. No one explained that by signing I would be giving up the right to have a judge or jury decide a dispute with New York Life or the right to bring or join a class action. No one explained any circumstances in which I could be required to share arbitration costs with New York Life.

25. No one told me that I could or should have a lawyer review the documents. I did not have a lawyer available to me, and at that time I had no friends or family members with any legal background or training I could have asked.

26. I do not recall being given a copy of the FINRA arbitration rules or the American Arbitration Association employment arbitration rules that the documents refer to, and no one explained to me that those rules could change over time.

**V. THE ARBITRATION PROVISIONS**

27. I have now reviewed Exhibits I and J to the Declaration of Nicholas Blahovec (the "Blahovec Declaration").

28. Exhibit I contains ten numbered pages of the Introductory Contract and does not include a countersignature page.

29. Exhibit J contains seven numbered pages of the TAS Agreement and also does not include a countersignature page.

30. Each document states that it is not effective unless a countersignature page is issued, signed, and countersigned by New York Life's authorized representatives and specifies the effective date.

///

31. The Introductory Contract's arbitration provision is Section 21 of its 25 numbered sections, on pages 8 and 9. The TAS Agreement's arbitration provision is Section 19 of its 21 numbered sections and begins on page 6. The title and first page of each document say nothing about arbitration.

32. Each of these documents is a preprinted New York Life form with blanks for the agent's name, address, and general office. The documents were prepared before I saw them, and I had no role in preparing them.

33. The arbitration provisions were not presented to me as separate agreements. Each was placed within a longer contract among sections addressing premiums, commissions, ledgers, liens, and similar subjects. Nothing in the emails from New York Life, and no one at New York Life, directed me to those sections.

34. New York Life has not attached to its motion the Agent's Contract I signed. I have now seen a copy of it, which New York Life produced in this case in May 2026. It is sixteen numbered pages long, it bears the same DocuSign envelope identification number as my TAS Agreement, and it likewise does not include a countersignature page. Its arbitration provision is Section 23, beginning on page 9, between a section on confidential information and a section on legal fees.

35. I am not and never have been registered with FINRA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 3, 2026, at Los Angeles, California.

DocuSigned by:

Sammuel Valdez

CD853A294C4B4D5...

SAMMUEL VALDEZ